IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT URBAN, et al.          :          CIVIL ACTION
                              :
          v.                  :
                              :
COMCAST CORPORATION, et al.   :          NO. 08-773


MEMORANDUM

Bartle, C.J.                                  October 28, 2008

Plaintiff Robert Urban, a former Comcast Corporation
employee, brings this putative class action under §§ 409 and
502(a) of the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. §§ 1109 and 1132(a), on behalf of
participants in and beneficiaries of the Comcast Corporation
Retirement-Investment Plan (the "Plan").  Defendants are the
Comcast Corporation ("Comcast"), several current and former
members of Comcast's Investment Committee (the "Investment
Committee defendants"), and several Comcast employees allegedly
responsible for monitoring the membership of the Investment
Committee in 2007 (the "Monitoring defendants").  The putative
class consists of all those who were participants in or
beneficiaries of the Plan at any time between February 1, 2007
and the present (the "Class Period") and whose accounts included
investments in Comcast company stock ("Company Stock").

Now before the court is the motion of defendants to
dismiss plaintiff's Amended Complaint.  Defendants contend that
the Amended Complaint fails to plead the basis of its allegations

with particularity as required under Rule 9(b) of the Federal
Rules of Civil Procedure and fails under Rule 12(b)(6) to state a
claim for relief under ERISA because plaintiff has not alleged
(1) an actionable statement, act, or omission and (2) loss
causation.

In Count I of his Amended Complaint, plaintiff seeks to
hold defendants liable for breach of their fiduciary duty of care
to Plan participants in violation of ERISA § 404(a)(1)(B), 29
U.S.C. § 1104(a)(1)(B).  He asserts that defendants failed to act
prudently with respect to the Plan's investment in Company Stock
during the Class Period.  Count II alleges that defendants
breached their fiduciary duty of loyalty under ERISA
§ 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) by placing their own
interests above those of the Plan participants with respect to
the administration of the Plan during the Class Period.  In Count
III, plaintiff states that defendants breached their fiduciary
duty to provide complete and accurate information under ERISA
§ 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), by
misrepresenting the financial risk associated with the Plan's
investment in Company Stock during the Class Period.  Count IV of
the Amended Complaint asserts that Comcast and the Monitoring
defendants breached their fiduciary duty to monitor the
Investment Committee defendants during the Class Period under
ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).
Finally, plaintiff in Count V seeks to hold all defendants
liable, under ERISA § 405(a), 29 U.S.C. § 1105(a), for breaches

of fiduciary duties committed during the Class Period by individual defendants on a theory of co-fiduciary liability.

## I.

In ruling on defendants' motion under Rule 12(b)(6), we must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level ....'"  Id. at 232 (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  In other words, a complaint must contain "enough factual matter (taken as true) to suggest" the elements of the claims asserted.  Id. at 234 (quoting Twombly, 127 S. Ct. at 1965).

We may consider documents relied on by the Amended Complaint as well as matters subject to judicial notice.  See Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004).  In an action brought under ERISA, these include (a) the plan documents, see Ward v. Avaya, Inc., 487 F. Supp. 2d 467, 471 n.4 (D.N.J. 2007); (b) Comcast's public filings with the Securities and Exchange Commission ("SEC"), see Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000); and (c) Comcast's stock prices, see Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000).

-3-

II.

For present purposes, we accept as true the following facts.  Defendant Comcast is a publicly held Pennsylvania corporation with its executive offices in Philadelphia.  As the largest cable operator in the United States, it offers a variety of consumer entertainment and communications products and services.  At all relevant times, Comcast Company Stock traded on the NASDAQ Stock Market.

Comcast is the "Sponsor" and "Administrator" of the Plan, a tax-deferred retirement savings vehicle for Comcast employees.  The Plan is a defined contribution plan under ERISA.[1] Eligible Comcast employees are able to contribute anywhere between 1% and 50% of their eligible annual compensation, subject to a limit of $15,500 per year.  Comcast generally contributes "matching" funds equal to a given Participant's contributions, capped at 6% of that Participant's eligible annual income.

Plan participants are able to direct their contributions along with the matching Comcast funds into one of several investment options, or "funds," made available by the Plan's "named fiduciary," that is, Comcast's Investment

_____

1.  ERISA defines a "defined contribution plan," also known as an "individual account plan," as a plan which "provides for an individual account for each participant and for benefits to be based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), 29 U.S.C. § 1002(34).

-4-

Committee.[2]  During the Class Period, the Investment Committee was charged with establishing the Plan's overall investment policy and managing assets and investment options available to the Plan participants.  Members of the Investment Committee during the Class Period included defendants Arthur Block, David L. Cohen, William Dordelman, Charisse Lillie, Melanie Penna, Lawrence Salva, William Strahan, Stanley Wang, and Elizabeth Weber.  Comcast's Compensation Committee had delegated the power to appoint and remove individual members of the Investment Committee to defendants Michael J. Angelikas, David L. Cohen, and John Doe No. 1 (the "Monitoring defendants").

From before the beginning of the Class Period on February 1, 2007 until December 12, 2007, the Summary Plan Description[3] provided that investment options "may include Company stock."  Among the options available to Plan participants were the Comcast Class A Common Stock Fund and Comcast Class A

---

2.  A "named fiduciary" is "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly."  ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

3.  A summary plan description ("SPD") is a document distributed by an employer to potential participants in a retirement plan before their enrollment.  It typically contains the terms and conditions of participation along with a description of the manner in which plan assets will be invested.  The SPD may also include a statement regarding the relative financial risk associated with the plan's investments.

Special Common Stock Fund (together, the "Comcast Stock Funds"),[4] both of which consisted solely of Company Stock.  Nothing in the Plan required a participant to invest any portion of his or her contributions (or the matching funds contributed by Comcast) in the Comcast Stock Funds.  Indeed, nothing in the Plan required or encouraged the Investment Committee to make such an investment available to Plan participants at all.  The Summary Plan Description notified potential participants that the value of any investments in the Comcast Stock Funds "fluctuates up and down" with the market price of the Company Stock, and that since the Funds are not diversified, they have "a higher degree of risk than the other funds."  On December 12, 2007, the Comcast Plan was amended to require, rather than simply permit, fiduciaries to include Company Stock as an investment option for Plan participants.

At the end of 2006 there were 89,172 participants in the Plan, which had assets at that time totaling $2.2 billion. Roughly 13% of the Plan assets consisted of Company Stock, amounting to a $293 million investment in Comcast securities by Comcast employees.  Plaintiff, like many other Plan participants, had invested his contributions in the Comcast Class A Common Stock Fund, which, as noted above, consisted solely of Company Stock.

---

4.  Plan participants were not permitted to transfer any new amounts into this Special Fund after November 18, 2002.

According to the Amended Complaint, Comcast issued a
press release on February 1, 2007, the beginning of the Class
Period, in which it announced its financial results for the
fourth quarter and year ending December 31, 2006.  It was a
record-setting year for Comcast, and Brian Roberts ("Roberts"),
Comcast's Chairman, President, and CEO, stated in the press
release that "[Comcast's 2006] performance demonstrates
substantial operating momentum, and we could not be more
enthusiastic about the future."  Roberts attributed much of
Comcast's 2006 success to their "Triple Play" offering, which
bundled internet, cable and telephone services for a promotional
price of $99 a month for the first year.

In that same press release, Comcast reported its "2007
Financial Outlook."  It projected, among other things, that in
2007 it would obtain:  (1) cable revenue growth of at least 12%;
(2) cable Revenue Growth Unit ("RGU")[5] net additions of
approximately 6.5 million, which was 30% above the 2006 net
additions of 5 million, and included an expected decrease of
500,000 circuit-switched phone RGUs; and (3) cable capital
expenditures of approximately $5.7 billion.

---

5.  The term "Revenue Growth Unit" describes the number of
discrete services (such as cable, internet or telephone) to which
Comcast customers subscribed.  For example, if one customer
subscribed to Comcast's Triple Play offering and received cable,
internet and telephone services, Comcast would count that
customer's subscription as three RGUs.

On February 1, 2007, Comcast also held a conference call with analysts to discuss its 2006 results and 2007 outlook. During this conference call, Roberts stated that:

> The Company has never been stronger.  We continue to be extremely bullish about our future and the positioning in 2007 in revenue and cash flow growth.  And let me take a minute and ... talk in specifics about our outlook.
>
> We believe, and this is probably the single most important point that I've been making for many months, that we have a moment in time first-to-market advantage.  And that the momentum we have will allow us to give guidance that we will do 30% more RGUs in 2007 than we did in 2006, getting us to around 6.5 million RGUs in one year.  We think we can capture market share now and this is the time to extend our lead in the market.  We're going to invest capital to drive that growth.  We're going to expand capacity to support future RGU growth beyond this and to continue to innovate new products and new businesses.

During the conference call, similar bullish statements were repeated by John Alchin ("Alchin"), Comcast's Co-Chief Financial Officer, Executive Vice President and Treasurer.  Alchin commented that "[RGU growth] shows that the best is yet to come," and that, "Basic subs are expected to grow even more in 2007 than they did in 2006."

Analysts responded to the February 1 press release and conference call by writing favorable reports regarding Comcast. Between February 1 and February 22, 2007, Company Stock traded between $39 and $43 a share.  On February 22, Comcast announced a 3 for 2 stock split, which reduced its share price to $27.45.

-8-

On April 11, in anticipation of the release of Comcast's first quarter financial results, Bloomberg TV interviewed Roberts.  He stated with respect to the 2007 outlook: "Right now it's all clicking, the business is on fire."  Between April 11 and April 26, Company Stock traded at prices as high as $28.18.

On April 26, 2007 Comcast issued a press release reporting RGUs of 1.8 million for the first quarter.  In it, Roberts was quoted as follows:

> We are off to a fabulous start to the year and see increasing momentum as we move ahead. Strong consumer demand for our superior products delivered through our Triple Play offering resulted in another quarter of record performance at our cable division – and we are just getting started capitalizing on the Triple Play opportunity.  This was our 3rd consecutive quarter of record-breaking RGU growth and 27th consecutive quarter of double digit OCF growth.  We are highly confident that our strategy and focus on operational execution and product innovation will deliver great results in 2007 and beyond.

In a conference call with analysts the same day, Roberts said, among other things, that, "[E]very one of our business lines is performing at or better than we had thought, the momentum is growing ....  We're very bullish on the full year ....  We're not changing any guidance ....  But I have to tell you, I think the momentum is fantastic."  In the same conference call, Comcast's Chief Operating Officer, Stephen B. Burke ("Burke"), added that:

> [W]e're taking a lot of momentum into the second quarter and a lot of the things that we've done in terms of infrastructure in the

-9-

> first quarter will pay off in the second,
> third and fourth quarters.  So in total 2007
> looks like it's going to be a very strong
> year.
>
> *       *       *
>
> We're off to a very strong start and if that
> continues there's no reason why we can't do
> better than we thought we would do when we
> gave guidance three months ago.

Analysts responded positively to the April 26 representations,

particularly to the Company's reiteration of the 2007 outlook.

Comcast held its 2007 Analyst and Investor Meeting on

May 1, 2007.  A Comcast press release dated the same day had

Roberts saying that:

> The Company believes that its financial
> performance will remain strong for the next
> several years:
>
> •     Cable revenue projected to grow a
>       compounded average of 12% per year for
>       2007-2009.
>
> •     Cable Operating Cash Flow (OCF)
>       projected to grow a compounded average
>       of 14% per year for 2007-2009.
>
> •     Comcast Digital Voice (CDV) projected to
>       reach a penetration level of 20-25% of
>       the Company's available homes passed.

As a result of these statements, analysts reported favorably

about Comcast the following day.

Plaintiff highlights in the Amended Complaint two

additional statements made by Roberts during the second quarter.

The first occurred at the Sanford Bernstein 23rd Annual Strategic

Decisions Conference on May 30, 2007, and the second at the

Merrill Lynch US Media Conference on June 7, 2007.  Each of these

-10-

statements echoed Roberts' previously expressed confidence in the strength of Comcast's business and his continued expectation of positive momentum.

Between April 26 and July 25, 2007, Company Stock traded for as much as $29 a share.  Roberts and Burke each sold shares of his stock during this period.  On May 24-25, Roberts sold 350,000 shares of common stock at prices of $26.80 and $27, for over $9.4 million.  Then, on June 4, Burke sold 235,792 shares at prices between $27 and $27.15, for $6.4 million.

Comcast made public on the morning of July 26, 2007 its financial results for the second quarter, the period ending June 30, 2007.  For the quarter, Comcast reported an increase in RGUs of 1.6 million and capital expenditures of $1.6 billion.  It also noted that it lost 90,000 basic video subscribers during that period.  Roberts and Burke nonetheless reiterated their optimistic forecast for the remainder of 2007 during a conference call with analysts the same day.  According to Roberts:

> We are on track to achieve all of our goals
> this year as Cable growth accelerates in the
> second half of 2007.  We continue to be very
> bullish about the future and expect the
> strength and momentum of our business to
> continue to deliver this kind of growth for
> years to come.
>
> *       *       *
>
> [T]he third quarter has always been better
> for high-speed data than the second quarter
> ....  We consider and feel that it's going to
> get bigger than it was in any prior quarter.
> So we're still going up the mountain.  So I
> think we have the business really operating
> very strongly.  You would not trade our

position.  We're questioning 12% of revenue,
whether we can make it more ....  And I think
we are on track for the full year as a big
picture.  So I think we've basically left all
of the guidance unchanged because at the
macro level, that's how we see things.

\*     \*     \*

... [I]f history's any guide ... assume that
the first half of the year was going to be
less than the second half of the year for
RGUs, and we would expect that to play out.

Burke confirmed the statements of his colleagues which suggested

that Comcast's performance during the second half of 2007 would

only improve:

[W]e don't consider [second quarter
subscriber loss] a cause for concern.  Some
of it is just the normal seasonality of the
business which is very hard to market
against.

\*     \*     \*

[I]f you look at the trends in the Comcast,
the classic, what we call classic Comcast
systems, they're actually pretty good ....  I
think the second half of the year is going to
look a lot like the second half of last year
and maybe an [sic] even a little bit better.
We certainly don't see the sort of macro
trends changing too dramatically in the
business.  We have an inkling of what the
third quarter is going to look like because
we're done with the month of July, or almost,
and the trends look pretty strong.

As a result of the reports on July 26, 2007, the price of Company

Stock fell from $28.54 on July 25, 2007 to $27.21 on July 26,

2007, a 4.7% decline.  Despite Comcast's mixed results for the

second quarter, however, analysts continued to report favorably

on the stock.

During the month of September, 2007, Roberts and Burke
each gave statements affirming his continued confidence in
Comcast's ability to meet the 2007 outlook, particularly its
ability to achieve 6.5 million cable RGUs before the end of the
year.  Both Roberts and Burke expressed their belief that,
although competition had increased, Comcast's products were
superior and the company was fundamentally strong.

On October 25, Comcast published a press release
announcing its financial results for the third quarter of 2007,
the period ending September 30 of that year.  For the quarter,
Comcast reported RGU additions of only 1.4 million, which was
less than analysts had expected based on earlier reassurances by
Comcast officers.  The press release also announced a loss of
65,000 video subscribers and an increase in capital expenditures
that was higher than anticipated by analysts.  Despite these
events, Comcast officers again reaffirmed the same optimistic
2007 outlook.  Roberts noted in a press release that Comcast
continued to perform well "both operationally and financially"
and had a "competitive advantage" that would "fuel ... growth
well into the future."

On October 25, Roberts, Burke, and Angelikas held
another conference call with analysts.  During the call,
Angelakis commented:

> We also remain focused on achieving our goal
> of adding 6.5 million net RGUs for the year,
> a 30% increase over 2006 ....

*     *     *

-13-

> We are maintaining our guidance of cable
> capital expenditures of approximately $5.7
> billion for 2007.
>
> ... As we finish the year, we expect that the
> fourth quarter will see additional growth in
> operating cash flow and a reduction in CapEx,
> which will result in increased free cash flow
> in the fourth quarter.

Roberts likewise remained positive, though he acknowledged an

increase in competition:

> We are seeing increasing competition and a
> softer economy and as a result, a slightly
> lower growth rate ....
>
> [W]e are now more comfortable than ever that
> 2007 represents our peak year in terms of
> capital expenditures as a percentage of
> revenue and that we will reaccelerate free
> flow growth in 2008.
>
> *     *     *
>
> We are very confident about the strength and
> long-term prospects of our business.  We are
> realistic about some of the business
> challenges, but nowhere do I see a more
> fundamentally strong and growing company in
> the telecom and entertainment sector.

As a result of the third quarter disclosures, the price of

Comcast common stock fell from $23.85 per share on October 24 to

$21.28 per share on October 25, 2007, a decline of approximately

11%.

On December 4, 2007, Comcast issued a press release

announcing a material revision of its 2007 outlook as follows:

cable RGU's of 6 million for the year, a decrease of 500,000, or

7.7%; cable capital expenditures of approximately $6 billion for

the year, an increase of $300 million, or 5%; and cable growth

-14-

revenue for the year approximating 11% instead of 12%.  The press release explained that the revision "reflected an increasingly challenging economic and competitive environment and [was] consistent with trends across the sector."  Based on these disclosures, the price of Comcast common stock fell an additional $2.55 per share, or 12.3%, from $20.73 on December 4, 2007 to $18.18 per share on December 5, 2007.

Plaintiff alleges in the Amended Complaint that during the Class Period, the company suffered from several weaknesses undisclosed to both the majority of Comcast employees and the market at large.  The bullish statements made by Comcast officers between February 1 and December 4, 2007 led to an "artificially inflated" trading price for Company Stock.  Plaintiff asserts that defendants knew or should have known about the undisclosed weaknesses and that Company Stock was therefore an "imprudent means of saving for retirement throughout the Class Period ...."

These undisclosed weaknesses, as set forth in the Amended Complaint, include the following:

(1)  Competition:  By the beginning of 2007, aggressive competition from other providers was negatively affecting the number of Comcast's RGUs and was forcing it to spend more to attract and retain customers.  This adverse trend worsened throughout the first quarter.  In addition, throughout the second and third quarters, the business environment in which Comcast was operating grew increasingly competitive causing Comcast to lose material numbers of its subscribers to competitors.

-15-

(2)   Customer Service:   Throughout 2007, Comcast experienced serious customer service problems.   This caused significant subscriber loss and materially threatened Comcast's ability to achieve its publicly stated 2007 outlook.

(3)   Triple Play:   Comcast's record growth in 2006 was largely due to its "Triple Play" package, which offered customers a promotional monthly rate for the first year on a bundle which included cable television, internet, and telephone service. Defendants publicly promoted the Triple Play package as the primary driver of their 2007 projections.   The success of Triple Play, however, turned out to be due primarily to the promotional rate at which the services were being offered.   After the twelve-month promotional rate expired and the total monthly cost for the services increased by 40% to 50% or more, some Triple Play subscribers chose to cancel their service with Comcast and subscribe instead with Comcast's competitors.   In an attempt to stem the loss of subscribers, Comcast extended the promotional rates for some customers beyond the initial twelve-month period. This further undermined Comcast's financial outlook.

(4)   Capital Expenditures for Network Improvements:   By early 2007, Comcast's level of capital expenditures necessary to upgrade and maintain its technology and equipment was rising beyond internal expectations.   Various Comcast Divisions reported that they were exceeding their capital budgets, and in particular, the Northern Division repeatedly failed to meet its

-16-

monthly budgets as it engaged in an initiative to upgrade its
communication networks.

(5)  FCC Ruling:  Effective July 1, 2007, the FCC
required cable companies to use cable boxes that would be
compatible with all cable providers.  This change would allow
customers to switch providers without changing their set-top box.
The new boxes were more expensive than the boxes previously used
by Comcast, which were not compatible with the services offered
by other cable companies.  Comcast, therefore, attempted to take
advantage of its current stock of cheaper set-top boxes before
the July 1 deadline and installed an unprecedented 2.1 million of
these boxes by June 30.  There were numerous costs associated
with their deployment.  Their price to customers was deeply
discounted to assure that Comcast could clear its inventory of
them.  Additionally, the increase in deployments resulted in
increased advertising, installation and customer support costs to
Comcast.  Defendants were also aware that some of its competitors
had received a waiver of the FCC requirement and were permitted
to continue using the lower-cost boxes.  This put Comcast at a
comparative disadvantage, caused it to lose price-sensitive
customers to competitors, and damaged its ability to compete for
new ones.

(6)  Capital Expenditures for Acquisitions:  By early
2007, Comcast's level of capital expenditures necessary to make
strategic cable acquisitions in order to remain competitive and
to integrate those newly acquired cable systems was rising beyond

-17-

expectations.  In particular, Comcast acquired substantially all of the assets of Adelphia Communications in the summer of 2006 and needed to expend significant sums to upgrade the Adelphia network.  In addition, Comcast spent at least $200 million to integrate a cable system in Houston, Texas which it acquired in January, 2007.

II.

Defendants first contend that plaintiff's ERISA claims are "grounded in fraud," and therefore that plaintiff must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) states that:  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) is to "give defendants 'notice of the claims against them, provide an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements.'"  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).

In contrast to Rule 8,[6] which only requires a pleading to contain facts that "raise a right to relief above the speculative level," Twombly, 127 S. Ct. at 1965, Rule 9(b)

---

6.  Rule 8(a)(2) states, "A pleading that states a claim for relief must contain:  ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief ...."

requires that a plaintiff provide "notice of the 'precise misconduct' with which defendants are charged ...." Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998). Our Court of Appeals has repeatedly emphasized that "'[a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Cal. Public Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (internal quotations omitted)). Nonetheless, "application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992) (quoting Christidis v. First Pa. Mortgage Trust, 717 F.2d 96, 99-100 (3d Cir. 1983)). Consequently, our Court of Appeals has cautioned that when applying Rule 9(b), courts should "respect the 'general simplicity and flexibility' of the Federal Rules of Civil Procedure," particularly when the information at issue may be in the defendants' control. Id. (quoting Christidis, 717 F.2d at 100)); see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).

        We agree with those courts in our Circuit that have held that where a plaintiff's claim for breach of fiduciary duty under ERISA is grounded in fraudulent conduct, the more stringent

-19-

pleading standard of Rule 9(b) must be satisfied.  See Pietrangelo v. NUI Corp., Civ. A. No. 04-3223, 2005 WL 1703200, at *9 (D.N.J. July 20, 2005); In re Ikon Office Solutions, Inc. Sec. Litig., 86 F. Supp. 2d 481, 488-89 (E.D. Pa. 2000).  We see no basis in the wording of Rule 9(b) or as a matter of public policy why ERISA claims alleging fraud should be treated differently than other fraud claims.  Where, however, the claims are grounded in unreasonable or imprudent conduct that does not implicate fraud on the part of a defendant even though the conduct resulted unknowingly from the fraud of another, the more liberal notice pleading standard of Rule 8(a) applies. Pietrangelo, 2005 WL 1703200, at *9.

        In the case at hand, plaintiff repeatedly alleges that defendants "knew or should have known" that Company Stock was "artificially inflat[ed]" during the Class Period and that the trading price of Company Stock would substantially decline when Comcast's underlying weaknesses were revealed to the market.  Am. Compl. ¶¶ 107, 116-17, 122.  These statements alone do not suggest that defendants intentionally misrepresented or withheld material information from plaintiffs.  Rather, they aver only that defendants failed to act prudently in light of information in their possession or that defendants imprudently failed to discover such information.  Accordingly, we conclude that insofar as plaintiff's complaint alleges non-fraudulent breaches of fiduciary duties by defendants, that is, breaches not involving

intentional misrepresentations or omissions, it must satisfy only the notice pleading standard of Rule 8.

We must give more careful scrutiny to plaintiff's allegations that go beyond simple averments of imprudence.  For instance, he repeatedly asserts that defendants "participat[ed] in creating and maintaining public misconceptions concerning the true financial health of the Company."  Id. ¶¶ 121, 146; see also ¶ 165-66.  He further contends that defendants breached their fiduciary duty of loyalty when they intentionally failed to disclose the Company's alleged weaknesses out of various selfish desires such as to maintain an artificially high price for Company Stock.  Id. ¶¶ 130-35.  Another example is plaintiff's allegation that defendants "breached their fiduciary duties by direct and indirect communications with the Participants, made in their fiduciary capacity, which contained statements concerning Company Stock that Defendants knew ... were untrue and inaccurate."  Id. ¶ 144; see also id. ¶ 146.  He also alleges that defendants made "material misrepresentations about the Company's financial condition" to Plan participants.  Id. ¶ 147; see also id. ¶ 149.  Although these claims do not employ the word "fraud," they can be read only as averments that defendants committed fraud, both by affirmative intentional misrepresentations and by intentional omissions.  Because we conclude that several of plaintiff's claims sound in fraud, we must determine whether he has pleaded such claims with the specificity required by Rule 9(b).

-21-

Applying the principles discussed above, we conclude that plaintiff's Amended Complaint adequately notifies defendants of the "precise misconduct" which serves as the basis for his claims of breach of fiduciary duty.  <u>Rolo</u>, 155 F.3d at 658. Plaintiff has scoured the public record for information as to the mechanism by which Comcast stock was made available to Plan participants and the role played by defendants in that process. It would be improper to dismiss plaintiff's claims simply because he has not yet identified the precise path by which relevant information made its way to certain upper-level Comcast employees.  Plaintiff alleges that such information is exclusively within defendants' control.  <u>See</u> Am. Compl. ¶ 8. Moreover, we have no reason to conclude at this time that plaintiff's allegations are frivolous.  <u>In re Suprema</u>, 438 F.3d at 270.

We note that the circumstances of this case are clearly distinguishable from those of <u>Clark v. Comcast Corp.</u>, Civ. A. No. 08-52, 2008 WL 3930560 (E.D. Pa. Aug. 25, 2008), a separate lawsuit also arising from the recent decline in Comcast stock. There, we dismissed a securities fraud action brought on behalf of Comcast's shareholders against Comcast and two of its high-ranking officers for failure to satisfy the combined requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  We emphasized that "the particularity requirement [of Rule 9(b)] has been rigorously applied in securities fraud cases" and that Congress intended the

-22-

PSLRA to "substantially heighten the existing pleading requirements" in securities fraud actions.  In re Rockefeller at 216-17 (citation omitted).  Our ruling was also based in large part on the absence of certain documentary evidence which the PSLRA required the Clark plaintiffs to present in support of their allegations.  2008 WL 3930560, at *9-*11.  Plaintiff's claims in this action are not subject to the PSLRA and the Amended Complaint does not suffer from any pleading deficiencies.

        Accordingly, we will deny defendants' motion to dismiss for failure to plead allegations of fraud with the requisite specificity pursuant to Rule 9(b).

                                III.

        Defendants next contend that we should dismiss plaintiff's Amended Complaint for failure to state a viable claim for relief under ERISA.

        Count I of the Amended Complaint alleges that all defendants breached their fiduciary duty of care under ERISA by failing to, among other things, "divest the Plan of Company Stock," "discontinue further contributions of Company Stock to the Plan," and "remove Company Stock as an investment option for the Plan" when defendants knew or should have known that the Company Stock was trading at an artificially inflated price.  Am. Compl. ¶¶ 112-26.  Plaintiff also suggests that defendants breached their duty of care by failing to "either consult or appoint independent fiduciaries regarding the appropriateness of

an investment in Company Stock" or to "resign as fiduciaries of the Plan."

ERISA § 404(a)(1) gives rise to several fiduciary duties owing from plan fiduciaries to plan participants, including the "duty of care," also known as the "duty of prudence."  In re Unisys Sav. Plan Litig., 74 F.3d 420, 433-35 (3d Cir. 1996).  The duty of care requires that a fiduciary act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).  It further demands that a plan fiduciary's investment decisions satisfy "an objective standard, focusing on a fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  In re Unisys, 74 F.3d at 434.  Plan fiduciaries are also required to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so ...."  ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

Significant exceptions apply, however, where the plan at issue qualifies as an "eligible individual account plan" ("EIAP") under ERISA § 407(d)(3).  That section provides:

> (A) The term "eligible individual account plan" means an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan ....
> (B) Notwithstanding subparagraph (A), a plan shall be treated as an eligible individual account plan with respect to the acquisition or holding of ... qualifying employer securities only if such plan explicitly provides for acquisition and holding of qualifying employer securities ....

29 U.S.C. § 1107(d)(3).  As our Court of Appeals has noted, "one of the purposes of EIAPs is to promote investment in employer securities ...."  Edgar v. Avaya, Inc., 503 F.3d 340, 347 (3d Cir. 2007).  In furtherance of that purpose, Congress included in ERISA a provision establishing that the statutory diversification requirement and the prudence requirement "to the extent that it requires diversification" no longer apply when the fiduciary of an EIAP invests plan assets in employer securities.  ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2).  Additionally, Congress exempted EIAPs from a generally applicable limitation on the percentage of a pension plan's assets that can be invested in employer securities.  ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1).[7]  As a consequence, EIAPs "'place employee retirement assets at much greater risk' than traditional ERISA plans."  Avaya, 503 F.3d at 347 (quoting Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1097 n.2 (9th Cir. 2004)).

---

7.  ERISA also provides that the standard prohibitions against dealing with a party in interest or self-dealing "shall not apply to the acquisition or sale by a plan of qualifying employer securities ... if the plan is an [EIAP]."  29 U.S.C. § 1108(e)(3)(A).

The Comcast Plan in this case is an individual account plan that is also a profit-sharing plan.  The Plan states that investment options "may include Company stock."  As a result of this language, the Plan qualifies as an EIAP because it "explicitly provides for acquisition and holding of qualifying employer securities."  29 U.S.C. § 1107(d)(3)(A).

Where a plan fiduciary decides to invest in employer securities, our Court of Appeals has applied differing levels of scrutiny based on whether the plan mandates, encourages, or simply permits such investments.  First, where a plan's settlor mandates investment in employer securities, the plan fiduciaries are "immune from judicial inquiry" related to such investments, essentially because they are implementing the intent of the settlor.  Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995).  By contrast, for plans at the other end of the spectrum which "only allow[] or permit[] a particular investment, 'the fiduciary must still exercise care, skill, and caution in making decisions to acquire or retain the investment.'"  Id. (quoting Restatement (Third) of Trusts § 228, comment (f)).  As a consequence, unfettered discretion in making investments is subject to de novo judicial review.  Id.; Avaya, 503 F.3d at 346.

Our Court of Appeals has crafted a third standard of review for the situation in which plan fiduciaries "were 'not absolutely required to invest in employer securities,' but ... were 'more than simply permitted to make such investments.'"  Avaya, 503 F.3d at 346-47 (quoting Moench, 62 F.3d at 571).

-26-

Under such circumstances, a fiduciary "who invests [plan] assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision." <u>Id.</u> at 347. The plaintiff may overcome that "presumption of prudence" by establishing that "the fiduciary abused its discretion by investing in employer securities." <u>Id.</u>

Defendants argue that <u>Avaya</u> extended the presumption of prudence to actions taken by fiduciaries of all EIAPs.  They reason that because EIAPs were crafted by Congress at least in part to promote investment in employer securities, a settlor's creation of an EIAP should be considered *per se* "encouragement" as to investment in employer securities.

We are unpersuaded.  A plan may qualify as an EIAP even where, as in this case, the settlor grants unfettered discretion to plan fiduciaries to invest or not invest plan assets in employer securities as they see fit.  However, the principles of trust law as enunciated by our Court of Appeals in <u>Moench</u> dictate that where the fiduciaries of a trust are not guided by the intent of the settlor, their decisions are subject to de novo review.  62 F.3d at 571.  We find no language in either <u>Avaya</u> or ERISA itself that undermines this conclusion.

According to plaintiff's Amended Complaint, the Comcast Plan as it existed between February 1, 2007 and December 12, 2007 did not encourage the Plan fiduciaries to make employer securities available to Participants as an investment option.  It merely provided that investment options "may include Company

-27-

stock."  Defendants retained complete discretion over whether to offer such securities as part of the Plan.  It was not until December 12, 2007, approximately a week after Comcast reported its fourth quarter earnings and suffered a related drop in stock price, that the Comcast Plan was amended to require that fiduciaries include Company Stock as an investment option for Plan participants.  If Comcast, as the settlor, had wanted to encourage or mandate investment in its stock before December 12, 2007, it knew how to do so and could have said exactly that in the Plan when it was established.  Then, and only then, the presumption of prudence would apply.  In contrast to the settlors in Moench and Avaya, Comcast, a sophisticated party, did no more than permit its fiduciaries to invest in Company Stock.  We therefore conclude that defendants are not entitled to a presumption of prudence for their actions between February 1, 2007 and December 12, 2007.[8]

Defendants assert that Count I of the Amended Complaint must also be dismissed because plaintiff cannot prove loss causation.  They cite the reasoning applied by our Court of Appeals in its dismissal in Avaya of the plaintiff's claim for breach of the fiduciary duty of disclosure.[9]  There, the court

---

8.  Plaintiff's Amended Complaint is unclear as to whether certain claims for relief are predicated upon actions taken by defendants after December 12, 2007.  We will determine the viability of such claims at a later date.

9.  See ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B); Section IV, infra.

discussed the ramifications of the "efficient-market hypothesis,"
that a stock's price will adjust immediately in response to the
revelation of positive or negative information about that stock.
503 F.3d at 350-51 (citing Edgar v. Avaya, Civ. A. No. 05-3598,
2006 WL 1084087, at *9 (D.N.J. Apr. 25, 2006)).  The court held
that even if the defendants in that case had disclosed the
alleged weaknesses to the market at an earlier date, as the
plaintiff suggested they should have, the price of company stock
would have dropped accordingly without allowing the plaintiff to
withdraw his investment at the higher stock price.  Id.  On the
other hand, defendants would likely have violated securities laws
prohibiting insider trading if they had earlier disclosed the
alleged weaknesses to the plan participants alone.  Id.

        Defendants contend that this argument is equally fatal
to plaintiff's claim for breach of the duty of care in the case
at hand.[10]  If defendants are correct, however, it is hard to
imagine that any ERISA claim for breach of fiduciary duty
predicated upon a drop in stock price after disclosure of
corporate weaknesses could survive a motion to dismiss where an
EIAP is involved.  Without further illumination from the Court of
Appeals, we conclude that its holding in Avaya is limited to a
claim for the breach of duty to disclose.  We do not extend its

---

10.  The Court of Appeals did not address loss causation with
respect to the Avaya plaintiffs' claim for breach of the duty of
care, having already found that the fiduciaries' decision to
invest in employer securities was sheltered by the presumption of
prudence.  503 F.3d at 347.

holding to foreclose a plaintiff's claim that the plan
fiduciaries breached their duty of care or of prudence by failing
to act where they knew or should have known material information
not available to plan participants or the market at large.  For
instance, in <u>Graden v. Conexant Sys., Inc.</u>, decided after <u>Avaya</u>,
the court allowed a similar claim to proceed where a plaintiff
alleged that the defendants "failed to take steps to protect the
Plan and its participants and minimize losses by, among other
things, ceasing to offer the [company stock] as an investment
option under the Plan."  Civ. A. No. 05-695, 2008 WL 4056537, at
*6 (D.N.J. Aug. 27, 2008).

Here, plaintiff alleges that defendants acted
imprudently by failing to take several actions that he argues
would have prevented or mitigated the alleged loss.  These
include resigning as Plan fiduciaries or closing the Comcast
Class A Common Stock Fund to new investments.  Expert testimony
will likely be required to estimate the effects that these
actions would have had on plaintiff's investment in the Fund.  We
conclude that the factual issues raised in the Amended Complaint
are too complex to permit early disposition of Count I on loss
causation grounds.

Next, Monitoring defendant Michael J. Angelikas avers
that Count I of the Amended Complaint must be dismissed against
him because plaintiff does not allege that he was a Plan
fiduciary subject to a duty of care with respect to the manner in
which Plan assets were invested.  A party must first be an ERISA

-30-

fiduciary before that party can be held liable for a breach of
fiduciary duty under ERISA.  In re Unisys Corp. Retiree Med.
Benefit ERISA Litig., 57 F.3d 1255, 1265 (3d Cir. 1995).  A
person qualifies as a plan fiduciary under ERISA if:

> (i) he exercises any discretionary authority
> or discretionary control respecting
> management of such plan or exercises any
> authority or control respecting management or
> disposition of its assets, (ii) he renders
> investment advice for a fee or other
> compensation, direct or indirect, with
> respect to any moneys or other property of
> such plan, or has any authority or
> responsibility to do so, or (iii) he has any
> discretionary authority or discretionary
> responsibility in the administration of such
> plan.

29 U.S.C. § 1002(21)(A).  In sum, "one is an ERISA fiduciary only
to the extent that one has discretion."  In re Ikon, 86 F. Supp.
2d at 490.  Thus, because a person can be a fiduciary with
respect to certain actions but not others, the inquiry is "highly
fact intensive ...."  Pietrangelo, 2005 WL 1703200, at *5.

Plaintiff does not challenge the argument of Angelika
in his response to defendants' motion to dismiss.  Indeed, the
face of the Amended Complaint supports Angelikas's contention.
Plaintiff's only allegation with respect to Angelikas is that he
"had and exercised power and responsibility to appoint, monitor
and replace members of the Investment Committee ...."  Am. Compl.
¶¶ 20(a), 21.  Because plaintiff fails to allege that Angelikas
had any authority, control, or responsibility for the investment
of Plan Assets, we will grant the motion to dismiss Count I of
the Amended Complaint against Angelikas.

-31-

We will deny the motion to dismiss pursuant to Rule 12(b)(6) with respect to Count I of the Amended Complaint for breach of the fiduciary duty of care against the remaining defendants.

                                IV.

Defendants also seek to dismiss Count III of the Amended Complaint in which plaintiff alleges a breach of the fiduciary duty to "provide complete and accurate information." ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B); In re Unisys, 74 F.3d at 442. Our Court of Appeals has held that plan fiduciaries are generally subject to a "duty to disclose" under ERISA which prohibits them from making material misrepresentations to plan participants, or withholding material information, "regarding the risks attendant to a fund investment." In re Unisys, 74 F.3d at 442. "In the investment context, 'a misrepresentation is material if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in a particular fund.'" Avaya, 503 F.3d at 350 (quoting id.).

In Avaya, the plaintiff claimed that plan fiduciaries should have disclosed certain material information regarding employer stock to plan participants or the market at large at some time prior to the announcement in the employer's quarterly earnings report. Id. at 350-51. As discussed above, the Court held squarely that the plaintiff did not state a claim for loss

-32-

causation.  Id.; supra at 30-32; see also Graden, 2008 WL
4056537, at *6-*8.  Consequently, "[t]hat defendants did not
inform Plan participants about several adverse corporate
developments prior to Avaya's earnings announcement, [did] not
constitute a breach of their disclosure obligations under ERISA."
Avaya, 503 F.3d at 350-51.

        We see no meaningful basis on which to distinguish the
disclosure claim dismissed by our Court of Appeals in Avaya from
that advanced by plaintiff here.  Accordingly, we will dismiss
Count III of plaintiff's Amended Complaint for failure to state a
claim upon which relief can be granted for loss causation.

                              V.

        Finally, defendants seek to dismiss Counts II, IV, and
V of the Amended Complaint in which plaintiff alleges breaches of
the fiduciary duty of loyalty and the fiduciary duty to monitor,
and seeks to impose co-fiduciary liability.  See ERISA
§§ 404(a)(1)(A)-(B), 405(a), 29 U.S.C. § 1104(a)(1)(A)-(B),
1105(a).  We conclude in each instance that plaintiff has stated
a claim upon which relief can be granted, including with respect
to loss causation.  Plaintiff may or may not be able ultimately
to prove these claims, but that is a question for another day.
We will therefore deny defendants' motion to dismiss insofar as
it seeks dismissal of Counts II, IV, and V of the Amended
Complaint.

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ROBERT URBAN                    :        CIVIL ACTION
                                :
          v.                    :
                                :
COMCAST CORP., et al.           :        NO. 08-773
```

ORDER

AND NOW, this 28th day of October, 2008, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1)  the motion of defendants to dismiss the Amended
Complaint is GRANTED in part and DENIED in part;

(2)  Count I of the Amended Complaint, alleging breach
of duty of care, is DISMISSED against defendant Michael J.
Angelikas;

(3)  Count III of the Amended Complaint, alleging
breach of the fiduciary duty to provide complete and accurate
information, is DISMISSED against all defendants; and

(4)  the motion of defendants to dismiss is otherwise
DENIED.

BY THE COURT:


/s/ Harvey Bartle III
                                                      C.J.