IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANELL T. MOORE          :        CIVIL ACTION
                            :
        v.              :
                            :
COMCAST CORPORATION, et al.   :        NO. 08-773

MEMORANDUM

Bartle, C.J.                                  April 6, 2010

Plaintiff Janell T. Moore, a former Comcast Corporation employee, brings this putative class action under §§ 409 and 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a), on behalf of participants in and beneficiaries of the Comcast Corporation Retirement-Investment Plan (the "Plan"). Defendants are the Comcast Corporation ("Comcast"), several current and former members of Comcast's Investment Committee (the "Investment Committee defendants"), and several Comcast employees allegedly responsible for monitoring the membership of the Investment Committee in 2007 (the "Monitoring defendants").

Now before the court is the motion of plaintiff to certify a plaintiff class, appoint Janell T. Moore as class representative, and appoint the law firm of Wolf Haldenstein Adler Freeman & Herz as class counsel pursuant to Rules 23(a) and (b)(1) of the Federal Rules of Civil Procedure.

Plaintiff alleges that defendants knew that one of the Plan funds, consisting almost entirely of Comcast common stock ("Company Stock Fund"), was artificially inflated from February 1, 2007 to December 5, 2007 (the "Class Period") but continued to invest money from participants into the Company Stock Fund.  Specifically, in Count I of the Second Amended Complaint, plaintiff seeks to hold defendants liable for breach of their fiduciary duty of care to Plan participants in violation of § 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).  She asserts that defendants failed to act prudently with respect to the Plan's investment in the Company Stock Fund during the Class Period.  Count II avers that defendants breached their fiduciary duty of loyalty under § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), by placing their own interests above those of the Plan participants with respect to Plan administration during the Class Period.[1]  Count IV asserts that Comcast and the Monitoring defendants breached their fiduciary duty to monitor the Investment Committee defendants during the Class Period under § 404(a)(1)(A) and (B).  Finally, in Count V plaintiff alleges liability under § 405(a) of ERISA, 29 U.S.C. § 1105(a), for

---

1.  In an order dated October 28, 2008, the court dismissed Count III of the Amended Complaint, alleging breach of a fiduciary duty for failure to provide "complete and accurate information," for failure to state a claim upon which relief can be granted for loss causation.  In that order, the court also dismissed Count I against Michael J. Angelikas.

breaches of fiduciary duties committed during the Class Period by individual defendants on a theory of co-fiduciary liability.

During her employment with Comcast, Moore began participating in the Plan, which is a defined contribution retirement benefits plan available to employees of Comcast and its subsidiaries. The Plan offered several investment funds among which participants could choose to allot their investment dollars. Throughout the Class Period, the Plan offered among its investment options the Company Stock Fund, even though the Plan documents did not require it to do so. Moore, as well as many other Plan participants, invested in this particular Fund.

On February 1, 2007, Comcast issued a press release announcing its financial results for the fourth quarter and year end of 2006, which were overwhelmingly positive. The release also contained a prediction of Comcast's 2007 performance, entitled "2007 Financial Outlook," which anticipated substantial continued growth.

On May 5, 2007, Moore's employment with Comcast was terminated. After consulting with an attorney, she signed a release in exchange for six months of severance benefits. In the release, she agreed to "knowingly and voluntarily waive, release and forever discharge" any and all past and present claims she had against Comcast. On May 31, 2007, Moore exercised stock options that had previously been granted as part of her compensation. She received $65,360.19. On September 11, 2007,

Moore liquidated her holdings in the Company Stock Fund and received $1,411.62.[2]

On December 4, 2007, after the markets closed, Comcast issued a press release materially revising Comcast's outlook for 2007 and painting a distinctly less favorable picture of the company's 2007 financial outlook than had been announced since the preceding February. As a result of these disclosures, the price of Comcast common stock fell $2.55, to $18.12 per share. At one point during the Class Period, the Comcast stock had traded as high as $29 per share.[3]

Moore alleges that from February 1, 2007 through December 5, 2007 "the Company's true financial and operating condition and prospects were materially worse than the upbeat statements led analysts and the market to believe. As a result, the prices at which the common stock traded in the open market were artificially inflated." Moore maintains that the defendants knew or should have known, based on this artificial inflation, that the Company Stock Fund was an imprudent investment for the Plan.

---

2. Investments in the Company Stock Fund made up approximately 11 percent of Moore's overall plan holdings from February 1, 2007 through September 11, 2007. Her remaining holdings were varied among other Plan funds.

3. As alleged in the Second Amended Complaint, the price of Comcast stock during the first three weeks of the Class Period was between $39 and $43 per share. On February 22, 2007, Comcast announced a 3:2 stock split, reducing its price per share to $27.45 per share (or $41.175 per pre-split share) on that date.

II.

Moore describes the class which she seeks to represent, pursuant to Rules 23(a) and (b)(1) of the Federal Rules of Civil Procedure, as:

> All persons who were participants in or beneficiaries of the Plan at any time from February 1, 2007 to December 5, 2007 (the "Class Period") and whose accounts included investments in the Comcast Class A Common Stock Fund or the Comcast Class A Special Common Stock Fund (the "Company Stock [Fund]").

Our Court of Appeals has explained that class certification "is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2009). In conducting such an analysis, we must thoroughly examine the factual and legal allegations relating to the certification issue. Id. Thus, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." Id. at 307. Factual determinations "supporting Rule 23 findings must be made by a preponderance of the evidence." Id. Additionally, we "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits - including disputes touching on elements of the cause of action." Id.

III.

Defendants first contend that Moore does not have standing to bring this action. It is well settled that the "irreducible constitutional minimum of standing" requires that the plaintiff has suffered an "injury in fact," which our Supreme Court has described as "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent[.]" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Needless to say, Moore must have suffered an injury-in-fact in order to serve as the named plaintiff in a class action. See Graden v. Conextant Sys. Inc., 496 F.3d 291, 302 n.14 (3d Cir. 2007). Section 502(a) of ERISA grants a Plan participant or beneficiary standing to bring a civil enforcement suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (2010). As the Supreme Court held in LaRue v. DeWolff, Boberg & Associates, "although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." 552 U.S. 248, 256 (2008).

Defendants maintain that Moore has suffered no such injury because she realized a profit when she sold her Plan holdings and Comcast stock options. Moore's expert Steven P. Fienstein, Ph.D., C.F.A., opines that she incurred a loss of

between $250.53 and $390.60.  Defendants argue that any loss that
Moore suffered in her Plan holdings must be offset by the
enhanced gain that she realized through her sale of Comcast
options which had been provided to her as part of her employment
compensation package outside of the Plan.

Moore sold her options on May 31, 2007, for $65,360.19,
when according to Moore, the price of the stock was artificially
inflated.  Defendants take the position that if Moore is correct,
she realized $7,948.69 more on that sale than she would have
realized had the stock not been artificially inflated.  They
maintain that any loss Moore suffered inside the Plan should be
offset by this enhanced profit.

In our view, Moore's unrelated sale of Comcast stock
options has no relevance as to whether she has suffered any
injury from defendants' purported breach of ERISA fiduciary
duties with respect to the Plan.  Moore's stock options were
granted to her and sold by her in transactions outside of and
independent of the Plan.  The defendants fail to cite to a single
case where a court has applied non-Plan profits to the
calculation of an ERISA plaintiff's Plan losses.  Defendants'
reliance on § 213 of the Restatement (Third) of Trusts is
misplaced.  Section 213 merely states that "the trustee is
accountable only for the net gain or chargeable only with the net
loss resulting therefrom."  This principle is unavailing since it
applies only to the net gain or loss *within* a trust, in this case

within an ERISA Plan fund.  Moore's stock options were not Plan holdings.

Defendants' reliance on <u>Edgar v. Avaya, Inc.</u>, 503 F.3d 340, 350 (3d Cir. 2007) is inapposite as <u>Avaya</u> deals only with gains and losses from sales within a Plan.  We find persuasive the reasoning of cases that hold that unrelated accounts should be treated separately and cannot be used to offset any relevant gains or losses within a Plan fund.  <u>See</u> <u>In re CIGNA Corp. Securities Litig.</u>, 459 F. Supp. 2d 338 (E.D. Pa. 2006); <u>Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.</u>, 315 F. Supp. 2d 666 (E.D. Pa. 2004).

Even in the absence of any offset from the sale of her Comcast stock options, defendants contend that Moore did not experience any monetary loss within the Plan and therefore cannot proceed as a plaintiff or as a class representative.  They argue that the "artificial inflation" methodology must be used in calculating Moore's loss.  As described by defendants' expert Vinita M. Juneja, Ph.D., one first determines what the price of a stock would have been had the market not been artificially inflated by false or misleading information.  That price is then compared with the actual price of the allegedly artificially inflated stock.  A loss occurs only if a plaintiff would have gained a greater profit or incurred a smaller loss by investing in non-inflated stock than what he or she actually gained or lost by investing in the inflated stock.  Under the artificial

inflation approach, Juneja calculated that Moore experienced a net gain of $203.52 from the Company Stock Fund.

Moore maintains that the proper way of measuring loss in ERISA fiduciary breach cases is the "alternative investment" methodology, which determines "the amount that affected accounts would have earned if prudently invested." Graden, 496 F.3d at 301, quoting Donovan v. Bierwith, 754 F.2d 1049, 1056 (2d Cir. 1985).[4] Under this approach, the court selects an alternative investment and then compares what Moore would have earned under that investment strategy with what she in fact earned through the allegedly imprudent Company Stock investment. Graden, 496 F.3d at 301. If Moore would have realized a greater profit with a prudent, alternative investment, she would be determined to have sustained a loss from her involvement in the Company Stock Fund.

Plaintiff's expert calculated that under the alternative investment methodology Moore lost between $250.53 and $390.60 (Pl.'s Ex. E at 15). Defense expert Juneja concedes that using that methodology produces a net loss to Moore, although Juneja calculates that loss to be between $57.08 and $203.51.

---

4. Defense expert Juneja refers to a "profit/loss" methodology. Alternative investment and profit/loss methodologies, as described by both plaintiff and defendants, are essentially the same. There are minor differences as described by plaintiff expert Fienstein and defense expert Juneja, but both methodologies involve comparing plaintiff's result from the Company Stock Fund to the result she would have achieved in an alternative fund. For clarity, the court shall refer to this overall approach as the "alternative investment" methodology.

Under Hydrogen Peroxide, 552 F.3d 305 (3d Cir. 2009), it is incumbent on the court at this stage of the proceedings to assess which is the appropriate methodology for calculating damages in order to determine whether Moore is has suffered an injury-in-fact. In Graden v. Conextant Sys. Inc., the Court of Appeals for the Third Circuit adopted the alternative investment approach for the measurement of damages in cases for fiduciary breaches under ERISA. 496 F.3d 291, 301 (3d Cir. 2007). While defendants are correct that the alternative investment approach is the appropriate method for assessing damages in a case of securities fraud, we do not have such a case before us. Id.

Moore has produced sufficient evidence for present purposes to demonstrate that she has suffered an injury-in-fact in the form of economic loss to her individual account.[5]

IV.

Defendants also argue that, even if Moore has suffered an injury-in-fact, she cannot serve as a class representative because she signed a release of her claims against Comcast on May 5, 2007. In In re: Schering Plough Corp. ERISA Litigation, our Court of Appeals has recently provided significant guidance on the validity of an ERISA release and its applicability to a

_____

5. Defendants also contend that even if Moore may represent a class seeking damages, she does not have standing to seek the injunctive relief of divestiture of common stock from the Company Stock Fund because she is no longer an employee of Comcast and has no current investment in the Plan. We do not have to address this issue since Moore seeks no such relief in the Second Amended Complaint.

plaintiff's ability to represent a class.  589 F.3d 585 (3d Cir.
2009).  In that case, the Court of Appeals considered whether
Michelle Wendel, a former employee of Schering-Plough who
participated in its defined contribution savings plan, could
serve as the sole class representative in an ERISA claim after
signing a separation agreement that granted her enhanced
severance compensation in exchange for a general release and
covenant not to sue the company.  See id. at 591-92.  The
District Court voided the release under § 410(a) of ERISA, which
provides that "any provision in an agreement or instrument which
purports to relieve a fiduciary from responsibility or liability
for any responsibility, obligation, or duty under this part shall
be void as against public policy."  29 U.S.C. § 1110 (2010).

        The Court of Appeals reversed.  It held that an
individual release of ERISA claims, signed by an employee, is
valid and not barred by the language of § 410(a).  The court
reasoned that voiding all individual releases would prevent a
person from ever being able to settle an ERISA claim and would
always require a trial.  Moore's release here is clearly valid.

        The Court of Appeals explained that the existence of a
release does not end our analysis and does not necessarily
prevent a plaintiff from being a class representative.[6]  If Moore

6.  While the Court of Appeals never specifically mentioned that
the plaintiff, who signed the release, must have suffered an
injury-in-fact, we presume that the basic requirements of
standing are unchanged.

meets the requirements of Rule 23, she may serve in this
capacity.

V.

We now turn to the question of whether Moore has
satisfied the elements for class certification under Rule 23(a)
and (b) of the Federal Rules of Civil Procedure.  Under Rule
23(a), she must demonstrate following:

> **a) Prerequisites.**  One or more members of a
> class may sue or be sued as representative
> parties on behalf of all members only if:
> (1) the class is so numerous that joinder of
> all members is impracticable;
> (2) there are questions of law or fact common
> to the class;
> (3) the claims or defenses of the
> representative parties are typical of the
> claims or defenses of the class; and
> (4) the representative parties will fairly
> and adequately protect the interests of the
> class.

These four prerequisites are commonly described as
numerosity, commonality, typicality, and adequacy.  Here,
defendants do not challenge Moore's contentions that the putative
class satisfies the numerosity or commonality requirements.  We
agree that this putative class with over 35,000 members meets the
numerosity prerequisite.  Moore has established, as well, that a
number of common issues pervade this case, including whether
defendants were fiduciaries of the Plan and whether defendants
breached their fiduciary duties by allowing the Plan to invest in
the Company Stock Fund.  A plaintiff need show only one common
issue to fulfill the commonality requirement.  In re the
Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283,

-12-

310 (3d Cir. 1998); <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994).

The typicality requirement of Rule 23(a)(3) "centers on whether the interests of the named plaintiffs align with the interests of the absent members." <u>Stewart v. Abraham</u>, 275 F.3d 220, 227 (3d Cir. 2001); <u>see also</u> <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 183 (3d Cir. 2001). The court must determine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." <u>Beck v. Maximus</u>, 457 F.3d 291, 295-96 (3d Cir. 2006) (citation omitted). Generally, "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." <u>Baby Neal</u>, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted). Finally, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." <u>Id.</u> Most recently, our Court of Appeals has cautioned that:

> [C]ourts must consider the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class. This investigation properly focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims.

In re: Schering Plough ERISA Litigation, 589 F.3d 585, 597-98 (3d Cir. 2009).

Adequacy of the named plaintiff, a closely related but separate inquiry under Rule 23(a)(4), requires "named plaintiffs' interests [to be] sufficiently aligned with the absentees'." In re Community Bank of Northern Virginia, 418 F.3d 277, 303 (3d Cir. 2005) (internal citation omitted).  The Supreme Court has noted that typicality and adequacy inquiries often merge because both look to potential conflicts and to "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Amchem Prods. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (quoting Gen. Tel. Co. Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  Because of the similarity of these two inquiries, questions of whether a unique defense, such as a release, or early liquidation of one's stock should defeat class certification are relevant under both prongs.

Defendants contend the release Moore signed presents a unique defense that renders Moore an atypical or inadequate class representative.  Moore responds that the release unambiguously allows her to assert a claim for the period of May 7, 2007 to September 11, 2007 and that the "unique defense" of the release will not feature sufficiently in the litigation to prevent certification.  Our Court of Appeals directs us to conduct a

factual inquiry when a sole named plaintiff has signed a release in an ERISA § 502(a) lawsuit, as we have here.

The Court of Appeals has stated in Beck v. Maximus, Inc., "a defendant must show some degree of likelihood a unique defense will play a significant role at trial" in order to defeat certification of the class on the grounds of typicality and adequacy. 457 F.3d 291, 300 (3d Cir. 2006). Furthermore, the main focus of the typicality inquiry must remain on whether Moore's incentives in litigating this case remain "typical, in common sense terms, of the class, thus suggesting that the incentives of [Moore] are aligned with those of the class." Id. at 295-96. If a unique defense will likely distract Moore and change her incentives in prosecuting this case, we cannot allow her to proceed as class representative.

It is undisputed that there are 35,394 putative class members. Five hundred fifty-four Comcast employees signed releases as part of an enhanced severance package during the proposed Class Period, from February 1, 2007 to December 5, 2007. All of these releases were identical to the one Moore signed. It is unknown how many of these 554 employees will be class members, although Moore concedes that there are likely to be fewer than this number. At most, approximately 1.5% of the putative class members have signed a release.

Pursuant to the releases signed by Moore and other participants, they "knowingly and voluntarily waive[d], release[d] and forever discharge[d]" any and all past and present

-15-

claims that they had against Comcast.  However, the releases made clear that "[t]his Agreement does not, however, release any rights or claims which may arise after the date on which you sign this Agreement, any rights which cannot be waived as a matter of law, and the rights and obligations of the parties under this Agreement."  Thus, a participant was free to pursue recovery for rights or claims arising after the date his or her releases was executed.

Since Moore's release bars her recovery for loss to her account for part of the proposed class period, we must determine whether typicality and adequacy exist for her to serve as class representative.  In Morrissey v. Curran, the Court of Appeals for the Second Circuit held that "ERISA impose[s] a continuing duty to review and liquidate improvident investments."  567 F.2d 546, 549 (2d Cir. 1977).  Several district courts in the Third Circuit have found this reasoning persuasive and have adopted it.  See Pension Ben. Guaranty Corp. v. Greene, 570 F. Supp. 1483, 1488-89 (W.D. Pa. 1983); Gilliam v. Edwards, 492 F. Supp. 1255, 1261 (D.N.J. 1980); Trustees of the Retirement Benefit Plan v. Equibank, 487 F. Supp. 58 (W.D. Pa.), appeal dismissed, 639 F.2d 772 (3d Cir. 1980).  In these cases, the plaintiff alleged that the breach of fiduciary duty had originated before the enactment of ERISA and continued thereafter.  The courts agreed with plaintiffs that the breach of fiduciary duty was a continuing wrong and allowed the action to go forward.

This reasoning, in our view, is equally applicable to Moore's individual claim where the alleged wrong began at a time barred by her release but has continued beyond the date on which she released her claims. The defendants had a continuing duty, under ERISA, to review the prudence of the Plan's holdings and divest the Plan of imprudent funds. See Morrissey, 567 F.2d at 549; 29 U.S.C. § 1104 (2010); see also Restatement (Third) Trusts § 92. If the defendants failed properly to exercise that duty throughout the class period, defendants have committed a continuing wrong. As a continuing wrong, the breach of fiduciary duty is continually arising anew. Thus, the release does not bar Moore from proceeding with the claim to the extent it occurs after May 7, 2007, the date on which she signed the release.

Had the defendants divested the Plan of the Comcast Stock Fund on or before May 7, 2007, we might have a different case. However, defendants did not do so and persisted in allowing the Plan to hold what Moore alleges was an imprudent investment until December 5, 2007. While, as noted above, Moore herself will not be able to recover for her individual account for any loss sustained during the period between February 1, 2007 and May 7, 2007, the evidence of the conduct of defendants and the price of the Comcast stock from February 1, 2007 onward will be highly relevant in order to prove the continuing breach of fiduciary duty which was occurring while she participated in the Company Stock Fund after she signed her release. On February 1, 2007, Comcast issued an exceedingly positive outlook for its

future earnings, and on December 4, 2007, after the markets had closed, it revised downward that previous 2007 outlook to a significant degree, causing a drop in the Comcast stock price. Without evidence of what took place during the entire ten month period, the jury will have an incomplete picture and it would be hampered in determining whether defendants breached their fiduciary duties to the Plan or any participant during any part of the proposed period.

In our view, defendants have not shown that Moore will need to devote significant "time and effort to the defense [of the release] at the expense of issues that are common and controlling for the class," or that the release is likely to constitute "a major focus of the litigation."  Beck, 457 F.3d at 297, 301; see also Schering Plough, 420 F.3d at 598.  Given that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories," we find that Moore is both a typical and an adequate class representative, notwithstanding the May 7, 2007 release or her September 11, 2007 liquidation of Plan holdings.  Baby Neal v. Casey, 43 F.3d 48, 58 (3d Cir. 1994).

Furthermore, the calculation of the ultimate recovery by Moore and the putative class members for their individual accounts, whether or not they have signed releases, does not defeat class action certification here.  "[I]t has been commonly recognized that the necessity for calculation of damages on an individualized basis should not preclude class determination when

the common issues which determine liability predominate." See
Bogosian v. Gulf Oil Co., 561 F.2d 434, 456 (3d Cir. 1977). This
lawsuit is an action on behalf of the Plan, and the intended
focus is on whether defendants breached their fiduciary duties.
See LaRue v. DeWolff, Boberg & Associates, 552 U.S. 248, 256
(2008). Again, the issue of the release is not likely to present
a major focus of the litigation, and we find that it alone will
not prevent Moore from serving as class representative.

> Our Court of Appeals has recently reiterated that:
>
> The similarity between claims or defenses of
> the representative and those of the class
> does not have to be perfect. ... [F]actual
> differences between the proposed
> representative and other members of the class
> do not render the representative aytpical if
> the claim arises from the same event or
> practice or **_course of conduct_** that gives rise
> to the claims of the class members.
> [emphasis added]

Schering Plough, 589 F.3d at 598. While Moore's specific claim
may occur over a shorter or different time period than other
class members' claims, there is a "strong similarity of legal
theories" based on a single "course of conduct" by defendants.
Baby Neal, 43 F.3d at 58; Schering Plough, 589 F.3d at 598.

We find persuasive the reasoning adopted by the court
in Jones v. NovaStar Financial Inc., 257 F.R.D. 181 (W.D. Mo.
2009). In that case, the plaintiff liquidated her Plan assets
only a few weeks into the five-month proposed class period but
sought to act as the class representative for an ERISA suit. The
court stated that "[t]hough [plaintiff] was able to minimize her

-19-

injury by cashing out early, the nature of her claims – that Defendant's alleged misconduct caused losses to the Plan – is typical of the claims of other class members." NovaStar, 257 F.R.D. at 189. The court pointed out that, "[b]ecause her assets will be affected, [plaintiff] has an incentive to maximize the recovery of the Plan, regardless of whether or not that recovery flows directly from her personal injury." Id. at 189. In claims for breach of fiduciary duty under ERISA, all class members have a shared interest in establishing defendants' liability that vastly outweighs any divergence of interests that arise from differing dates of purchase and sale. See DiFelice v. U.S. Airways, 235 F.R.D. 70, 79 (E.D. Va. 2006).

Having determined that Moore has satisfied the four prerequisites for class certification under Rule 23(a), we now turn to whether her claim meets the requirements for certification under Rule 23(b). Moore maintains that certification under Rule 23(b)(1)(A) or 23(b)(1)(B) is appropriate.

Rule 23(b)(1) provides:

A class action may be maintained if Rule 23(a) is satisfied and if:
(1) prosecuting separate actions by or against individual class members would create a risk of:
(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair

or impede their ability to protect their interests.

We agree with Moore that certification under Rule 23(b)(1)(B) is appropriate in this case.  In <u>Schering Plough</u>, our Court of Appeals upheld the district court's holding that a nearly-identical breach of fiduciary duty claim for a defined contribution plan met the requirements of Rule 23(b)(1)(B).  589 F.3d 585, 604-05 (2009).  The court noted that the plaintiff's "proofs regarding defendants' conduct will, as a practical matter, significantly impact the claims of other Plan participants and of employees who invested in the Stock Fund." <u>Id</u>. at 604.  The court affirmed that, despite the defined contribution context, "breach of fiduciary duty claims brought under § 502(a)(2) are paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class." <u>Id</u>.  We find that the claims alleged fulfill the requirements for certification under Rule 23(b)(1)(B).

For the aforementioned reasons, we will grant class certification for Moore's claims and appoint Janell T. Moore as class representative.

## VI.

Finally, Moore seeks to have the law firm of Wolf Haldenstein Adler Freeman & Herz appointed as class counsel.  The firm is experienced in class action and ERISA litigation and is capable of conducting this lawsuit and protecting the interests

of putative class members.  There is no opposition to this appointment.  We will grant Moore's motion in this regard.